# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-2032

_____

Trip Mate, Inc., formerly known as Trip Mate Agency, Inc.

*Plaintiff - Appellee*

v.

Stonebridge Casualty Insurance Company; Legacy General Insurance Company;
Life Investors Insurance Company of America, also known as Transamerica Life
Insurance Company

*Defendants - Appellants*

------------------------------

Unique Vacations, Inc., Brought over from case no. 4:11-cv-01097-ODS

*Plaintiff*

v.

Trip Mate, Inc., Brought over from case no. 4:11-cv-01097-ODS; Stonebridge
Casualty Insurance Company, Brought over from case no. 4:11-cv-01097-ODS;
Life Investors Insurance Company of America; Legacy General Insurance
Company, Brought over from case no. 4:11-cv-01097-ODS

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 8, 2014
Filed: October 6, 2014

_____

Before BENTON, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Stonebridge Casualty Insurance Co. (Stonebridge) appeals the district court's judgment in favor of Trip Mate, Inc. (Trip Mate) following a bench trial. The district court held that Stonebridge breached an implied amendment to the parties' Managing General Agent Agreement that was incorporated into the Termination Agreement they executed in 2009. We reverse.

## I.   BACKGROUND

Trip Mate began doing business in the travel insurance industry in 1989. Trip Mate acts as the agent for insurance companies, and it markets, administers, and sells to travel organizers[1] the right to sell travel insurance policies. The contract between Trip Mate and a travel organizer is known as a Travel Organization Agreement (TOA). The TOA authorizes the travel organizer to offer travelers the option of buying travel insurance issued by the insurers Trip Mate represents.

From 1989 to 2009, Trip Mate served as the agent for various entities from a "family" of insurance companies known as the AEGON group. Stonebridge was the

_____

[1]Travel organizers are businesses that combine various aspects of travel packages (transportation, lodging, etc.) for sale to the general public.

last such insurer, and for purposes of clarity we collectively refer to the members of the AEGON Group as Stonebridge.

In 1997, Stonebridge purchased Trip Mate. At that point, Bradley Finkle, Trip Mate's prior owner, continued to manage the company. As part of the purchase transaction, Finkle and his wife were given the option to re-purchase the company via a stock buy-out option. They exercised this option in 2004 and entered into a Stock Purchase Agreement (SPA) with Stonebridge. The parties simultaneously executed a Managing General Agent Agreement (MGAA), which remained in effect until Stonebridge and Trip Mate terminated their relationship in 2009. The MGAA authorized Trip Mate to "market, underwrite, and service the travel insurance policies" on Stonebridge's behalf. The MGAA also authorized Trip Mate to issue insurance policies and required it to place policy premiums in a Premium Trust Account that Trip Mate held in trust for Stonebridge.

Article C of the MGAA described the parties' rights and obligations with respect to funds in the Premium Trust Account. On a monthly basis, Trip Mate was required to remit all funds in the Premium Trust Account to Stonebridge. However, Trip Mate was authorized to use funds from this account to pay a number of Stonebridge's obligations, including (1) making "refund[s] of premiums to persons entitled to them," and (2) paying Trip Mate's compensation for services performed under the terms of the MGAA. The MGAA did not define the term "premium" or identify which persons or entities might be entitled to a refund of premiums.

Article F of the MGAA contained part of the parties' compensation agreement. However, rather than explaining the details of Trip Mate's compensation, Article F merely stated that Stonebridge "agree[d] to pay [Trip Mate] an amount of compensation to be agreed upon in writing" by the parties. Article F further provided that any costs Trip Mate incurred related to marketing, selling, and administering

insurance policies, along with any commissions due to its marketing representatives, were to be paid out of Trip Mate's own compensation.

Sometime before 1997, Trip Mate began including profit sharing provisions in its TOAs with some of its larger clients. Under these agreements, if claims by the travel organizer's customers fell below a certain percentage of the net premium for the "Premium Year," the travel organizer received a share of that difference. Trip Mate continued its profit sharing practice during the time when Stonebridge owned the company. In addition, although the MGAA did not explicitly authorize profit sharing, Trip Mate continued the practice after the Finkles re-purchased the company and until the parties terminated their relationship in 2009. Trip Mate used funds from the Premium Trust Account to pay profit sharing and disclosed these deductions to Stonebridge in various reports and audits.

In November 2009, Stonebridge and Trip Mate terminated their relationship via a written Termination Agreement. The Termination Agreement was intended to resolve all outstanding issues and matters between the parties, including Stonebridge's release of a potential $16 million claim it had against Trip Mate. However, section 6 of the Termination Agreement provided that several provisions of the MGAA, including Article C, would remain in effect for a period of time sufficient to resolve any liabilities from run-off claims. Section 6 further stated that the MGAA and the amendments to it were attached as exhibits. Finally, section 14.1 of the Termination Agreement contained an integration clause that superseded any prior oral or written arrangements or understandings between the parties.

In July 2010, Trip Mate calculated profit sharing due under its TOAs with two travel organizers–Avanti Destinations (Avanti) and Unique Vacations (Unique). Trip Mate concluded Avanti was owed approximately $146,000 and Unique was owed $324,827.30. There were insufficient funds in the Premium Trust Account to pay these obligations, so Trip Mate paid Avanti $100,000 out of its own funds. Trip Mate

then notified Stonebridge that it was liable for the profit sharing owed to Unique and requested reimbursement for Trip Mate's $100,000 payment to Avanti. Stonebridge refused to pay these amounts and instead claimed that Trip Mate was liable for the profit sharing obligations.

Trip Mate chose not to pay Unique, and Unique subsequently sued both Trip Mate and Stonebridge for breach of contract. Trip Mate and Stonebridge filed cross-claims alleging the other was liable for the amounts owed to Unique. Trip Mate filed a separate suit against Stonebridge seeking reimbursement for its $100,000 payment to Avanti. The district court consolidated the two lawsuits.

Stonebridge and Trip Mate filed numerous pleadings that asserted several legal theories for why the other was liable for the profit sharing. Trip Mate claimed it was acting as Stonebridge's duly authorized agent when it signed the TOAs with Unique and Avanti and was thus not personally liable under the contracts. Trip Mate further alleged that profit sharing was a "premium refund" for purposes of Article C that could be paid with funds from the Premium Trust Account. Finally, Trip Mate argued that Stonebridge was unjustly enriched by Trip Mate's profit sharing payment to Avanti since Stonebridge was liable for the amount paid.

Stonebridge countered that Trip Mate was not authorized to engage in profit sharing and thus was not acting as Stonebridge's agent when it agreed to the profit sharing provisions in Avanti's and Unique's TOAs. Stonebridge further claimed that Trip Mate's profit sharing obligations were commissions, and that the MGAA thus required Trip Mate to pay these obligations out of its own compensation.

The district court conducted a two-day trial. Trip Mate presented its case the first day, and all of its evidence was directed to the issues contained in its pleadings. At the end of the first day's proceedings, the district court made the following statement to the parties:

Obviously, one of the issues here is, irrespective of what the [MGAA] says, was there a course of dealing which effectively modified the terms of the [MGAA]. I don't know whether you want to deal with that in your presentations tomorrow or whether you want to deal with it post-trial by way of additional briefing, but I'll tell you that that is an issue that I see, and I would like some help in trying to make my way through it. Okay. And then the followup to that seems to me is that if the [MGAA] was modified through a course of conduct, then what effect does the termination agreement have? Does it terminate the agreement as modified, does it terminate the original agreement? Those are legal issues that I think need to be addressed at some stage.

Stonebridge presented its defense on the second day of trial, and neither party expressly offered any evidence on the issues raised by the district court the previous day regarding the "course of dealings" amendment theory. At the close of proceedings, one of the attorneys noted that he "got the impression that the court might be asking [the parties] for some additional briefing." The district court replied that it just wanted a brief from each of the parties addressing the issues they thought were important.

The parties' post-trial briefs focused exclusively on the claims, counterclaims, and defenses contained in their pleadings. Trip Mate reiterated its argument that the MGAA authorized it to bind Stonebridge to profit sharing contracts and to use Premium Trust Account funds to pay these profit sharing "premium refunds." Trip Mate further argued that the parties had engaged in a twenty year course of conduct whereby Trip Mate administered profit sharing payments on behalf of Stonebridge.

Stonebridge contended that Trip Mate was not authorized to bind Stonebridge to profit sharing contracts and that Trip Mate's profit sharing obligations were commissions it had to pay out of its compensation. Stonebridge also noted that the parties' course of dealings supported its interpretation of the term "compensation" for

purposes of the MGAA. Stonebridge did not, however, address whether the parties amended the MGAA by their course of dealings.

The district court rejected all of Trip Mate's theories of relief. It first concluded that neither the MGAA nor Stonebridge's conduct provided Trip Mate with actual or apparent authority to bind Stonebridge to profit sharing contracts. The district court thus held that Trip Mate, and not Stonebridge, was directly liable for the profit sharing contained in its TOAs with Avanti and Unique. It further determined that travelers, not travel organizers, paid premiums and that profit sharing therefore did not fit within the customary and ordinary concept of "refund of premiums." The district court thus concluded the express terms of the MGAA did not authorize Trip Mate to pay profit sharing with funds from the Premium Trust Account.

With little explanation, the district court also rejected Stonebridge's argument that profit sharing was a commission that Trip Mate was required to pay out of its compensation. The district court instead held in favor of Trip Mate based on a theory the parties neither pled nor argued–that their course of dealings amended Article C of the MGAA "by creating an additional circumstance under which payments from the Premium Trust Account were permitted." Specifically, the district court concluded that Stonebridge's "knowing acquiescence" in Trip Mate's use of Premium Trust Account funds to pay profit sharing indicated that "Stonebridge effectively agreed profit sharing was a debt it would pay out of its share of the premiums." The district court further determined this "amendment" to Article C survived the parties' 2009 Termination Agreement. The district court thus held that Stonebridge was obligated to reimburse Trip Mate for the $100,000 it paid to Avanti and the $324,827.30 it owed to Unique. The district court did not, however, formally amend the pleadings to include the implied amendment theory or discuss whether the parties consented to trying this new theory.

-7-

Stonebridge appeals, claiming the district court erred by (1) finding in favor of Trip Mate on the grounds of an implied amendment to the MGAA because this legal theory was outside the scope of the pleadings; (2) holding profit sharing payments were not commissions that Trip Mate was required to pay out of its own compensation; (3) holding the alleged implied amendment survived the parties' 2009 Termination Agreement; and (4) finding Trip Mate sufficiently proved any profit sharing was owed.

## II.    DISCUSSION

Stonebridge first argues that the district court erred by finding in favor of Trip Mate because the court's implied amendment theory was outside the scope of the pleadings.  As noted above, the district court rejected the theories of recovery Trip Mate pled and argued, and its judgment in favor of Trip Mate was instead based solely on the implied amendment theory.  Trip Mate does not appeal any aspect of the district court's judgment.  Stonebridge thus contends that, since the parties neither pled nor consented to trying this theory, we should reverse the district court and remand with instructions to enter judgment in favor of Stonebridge.  We agree.

Rule 15(b)(2) of the Federal Rules of Civil Procedure provides that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  Fed. R. Civ. P. 15(b)(2).  Such amendments are "to be liberally granted where necessary to bring about the furtherance of justice and where the adverse party will not be prejudiced." Am. Fed'n of State, Cnty. & Mun. Emps. v. City of Benton, 513 F.3d 874, 883 (8th Cir. 2008) (internal quotation omitted).  Trip Mate concedes that the parties did not expressly consent to trying the implied amendment issue.  Thus, the question before us is whether the parties tried the issue by implied consent.

The district court's decision to grant or deny an amendment under Rule 15(b)(2) is reviewed for abuse of discretion. Am. Family Mut. Ins. Co. v. Hollander, 705 F.3d 339, 347 (8th Cir. 2013). Stonebridge, however, argues that the district court's failure to mention or analyze whether the parties impliedly consented to trying this new issue requires us to undertake de novo review. Stonebridge is incorrect.

Rule 15(b)(2) provides that, although a party may move at any time to amend the pleadings to conform to the evidence or to raise an unpleaded issue, failure to amend does not affect the result of the trial on that issue. In addition, "a district court may amend the pleadings merely by entering findings on the unpleaded issues." Galindo v. Stoody Co., 793 F.2d 1502, 1513 n.8 (9th Cir. 1986). Here the district court amended the pleadings by entering findings regarding the implied amendment. Our task is to determine whether the district court, in so doing, abused its discretion. Hollander, 705 F.3d at 347.

"Implied consent exists where a party has actual notice of an unpleaded issue and has been given an adequate opportunity to cure any surprise resulting from the change in the pleadings." Id. at 348 (internal quotation omitted). A party generally has actual notice if the opposing party communicates its intention to amend the pleadings, or the court announces at or before trial that it will treat the pleadings as amended. Id. In addition, "consent may be implied when evidence relevant to an unpleaded issue has been introduced at trial without objection" if it is clear Stonebridge, as the non-moving party, had actual notice of the implied amendment claim and an adequate opportunity to cure any surprise. Id. at 348-49. However, evidence that is relevant to a pleaded issue generally will not by itself provide notice to a non-moving party that an unpleaded issue is being tried. Pariser v. Christian Health Care Sys., Inc., 816 F.2d 1248, 1253 (8th Cir. 1987).

Trip Mate argues that the district court's rather vague comments at the end of the first day of trial about the parties' course of dealings put them on notice that the district court was amending the pleadings. The parties' response to these comments tells a much different story.

During the second day of trial, neither party provided any witness testimony or submitted any exhibits directly related to their course of dealings. In addition, both parties' post-trial briefs indicate Trip Mate and Stonebridge understood any course of dealings evidence was in support of their respective interpretation of terms explicitly included in the MGAA. Neither party mentioned or argued that their course of dealings actually amended the MGAA.

We are deeply skeptical that lead counsel for Stonebridge and Trip Mate, both of whom are experienced, well-respected members of their state's bar, would have blatantly ignored the implied amendment issue if they had "actual notice" that it was part of the case. Hollander, 705 F.3d at 348. Indeed, at oral argument both counsel conceded the district court's holding was a "curveball" which took them by surprise. We thus conclude that the district court's comments to the parties regarding their course of dealings were too vague and ambiguous to provide the parties with actual notice that the court amended the pleadings to include the implied amendment theory.

Trip Mate's additional argument that the parties' consent should be implied because they did not object to the introduction of evidence that supported the implied amendment theory is also without merit. Trip Mate correctly notes that amendment under Rule 15(b)(2) is not foreclosed merely because "evidence bearing on [pleaded and unpleaded] claims may well overlap in a given case." Id. at 349 (quotation omitted). We refuse to ignore, however, that "the dispositive inquiry is whether [Stonebridge] had actual notice of the unpleaded claim and an adequate opportunity

-10-

to cure any surprise resulting from the change of the pleadings." Id. (internal quotation omitted).

Through the lens of hindsight we can see that the district court probably attempted to amend the pleadings during the first day of trial. The parties, however, reasonably and quite clearly misunderstood the district court's vague comments about their course of dealings, and the court took no steps to clarify this obvious misunderstanding during the trial or in its instructions to the parties regarding their post-trial briefs. The parties thus did not have actual notice of the implied amendment issue or an adequate opportunity to cure the surprise of this issue being added to the case. Id. at 348-49. The parties therefore did not consent to trying the implied amendment issue, and the district court abused its discretion by adding it to the pleadings. Id.

The district court rejected all of the legal theories Trip Mate pled and argued, and Trip Mate does not appeal any aspect of the district court's holding.[2] Because the district court improperly added the implied amendment theory to the pleadings, there is no remaining basis for the district court's judgment against Stonebridge in favor of Trip Mate.

---

[2]The district court did not explicitly address Trip Mate's unjust enrichment claim. This claim, however, was predicated on Trip Mate's assertion that Stonebridge was directly liable for the profit sharing owed to Avanti. Because the district court held Stonebridge was not directly liable for profit sharing under the theories Trip Mate pled and argued, we conclude the district court also impliedly rejected Trip Mate's unjust enrichment claim.

## III.  CONCLUSION

For the reasons stated above, we reverse the district court's judgment in favor of Trip Mate and remand with instructions to dismiss the case.

_____