# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-3052

_____

Russell Bucklew

*Plaintiff - Appellant*

v.

Anne L. Precythe, Director of the Department of Corrections, et al.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 2, 2018
Filed: March 6, 2018

_____

Before WOLLMAN, LOKEN, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge

The issue is whether the Eighth and Fourteenth Amendments, as applied, bar Missouri officials from employing a procedure that is authorized by Missouri statute to execute Russell Bucklew.

In March 2006, Bucklew stole a car; armed himself with pistols, handcuffs, and a roll of duct tape; and followed his former girlfriend, Stephanie Ray, to the home of

Michael Sanders, where she was living. Bucklew knocked and entered the trailer with a pistol in each hand when Sanders's son opened the door. Sanders took the children to the back room and grabbed a shotgun. Bucklew began shooting. Two bullets struck Sanders, one piercing his chest. Bucklew fired at Sanders's six-year-old son, but missed. As Sanders bled to death, Bucklew struck Ray in the face with a pistol, handcuffed Ray, dragged her to the stolen car, drove away, and raped Ray in the back seat of the car. He was apprehended by the highway patrol after a gunfight in which Bucklew and a trooper were wounded.

A Missouri state court jury convicted Bucklew of murder, kidnaping, and rape. The trial court sentenced Bucklew to death, as the jury had recommended. His conviction and sentence were affirmed on direct appeal. State v. Bucklew, 973 S.W.2d 83 (Mo. banc 1998). The trial court denied his petition for post-conviction relief, and the Supreme Court of Missouri again affirmed. Bucklew v. State, 38 S.W.3d 395 (Mo. banc 2001). We subsequently affirmed the district court's denial of Bucklew's petition for a federal writ of habeas corpus. Bucklew v. Luebbers, 436 F.3d 1010 (8th Cir. 2006). The Supreme Court of Missouri issued a writ of execution for May 21, 2014. Bucklew filed this action under 42 U.S.C. § 1983, alleging that execution by Missouri's lethal injection protocol, authorized by statute, would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments as applied to him because of his unique medical condition. Bucklew appeals the district court's[1] grant of summary judgment in favor of the state defendants because Bucklew failed to present adequate evidence to establish his claim under the governing standard established by the Supreme Court in Baze v. Rees, 553 U.S. 35 (2008), and Glossip v. Gross, 135 S. Ct. 2726 (2015). Reviewing the grant of summary judgment *de novo*, we affirm.

---

[1]The Honorable Beth Phillips, United States District Judge for the Western District of Missouri.

**I.**

Missouri's method of execution is by injection of a lethal dose of the drug pentobarbital. Two days before his scheduled execution in 2014, the district court denied Bucklew's motion for a stay of execution and dismissed this as-applied action *sua sponte*. On appeal, a divided panel granted a stay of execution, Bucklew v. Lombardi, 565 Fed. Appx. 562 (8th Cir. 2014); the court en banc vacated the stay. Bucklew applied to the Supreme Court for a stay of execution, and the Court issued an Order granting his application "for stay pending appeal in the Eighth Circuit." This court, acting en banc, reversed the *sua sponte* dismissal of Bucklew's as-applied Eighth Amendment claim and remanded to the district court for further proceedings. Bucklew v. Lombardi, 783 F.3d 1120, 1128 (8th Cir. 2015) ("Bucklew I"). On the same day, the en banc court affirmed the district court's dismissal on the merits of a facial challenge to Missouri's lethal injection protocol filed by several inmates sentenced to death, including Bucklew. Zink v. Lombardi, 783 F.3d 1089, 1114 (8th Cir.), cert denied, 135 S. Ct. 2941 (2015).[2]

---

[2]"The doctrine of res judicata or claim preclusion bars relitigation of a § 1983 claim if the prior judgment was a final judgment on the merits rendered by a court of competent jurisdiction, and if the same cause of action and the same parties or their privies were involved." Baker v. Chisom, 501 F.3d 920, 925 (8th Cir. 2007), cert denied, 554 U.S. 902 (2008). As Bucklew was a plaintiff in Zink, any facial challenge to the current method of execution in this case is precluded. Defendants argue that Bucklew's as-applied challenge is also precluded because it could have been raised in Zink. See Brown v. St. Louis Police Dep't, 691 F.2d 393, 396 (8th Cir. 1982). Like the district court, we decline to address this complex issue. See Bucklew I, 783 F.3d at 1122 n.1; cf. Whole Woman's Health v. Hellerstedt, 136 S. Ct 2292, 2305 (2016). We likewise decline to address defendants' claim that Bucklew's as-applied challenge is barred by the applicable statute of limitations. See Boyd v. Warden, Holman Corr. Facility, 856 F.3d 853, 874-76 (11th Cir. 2017).

Our decision in Bucklew I set forth in considerable detail the allegations in Bucklew's as-applied complaint regarding his medical condition. 783 F.3d at 1124-26. Bucklew has long suffered from a congenital condition called cavernous hemangioma, which causes clumps of weak, malformed blood vessels and tumors to grow in his face, head, neck, and throat. The large, inoperable tumors fill with blood, periodically rupture, and partially obstruct his airway. In addition, the condition affects his circulatory system, and he has compromised peripheral veins in his hands and arms. In his motion for a stay of execution in Bucklew I, Bucklew argued:

> Dr. Joel Zivot, a board-certified anesthesiologist . . . concluded after reviewing Mr. Bucklew's medical records that a substantial risk existed that, because of Mr. Bucklew's vascular malformation, the lethal drug will likely not circulate as intended, creating a substantial risk of a "prolonged and extremely painful execution." Dr. Zivot also concluded that a very substantial risk existed that Mr. Bucklew would hemorrhage during the execution, potentially choking on his own blood -- a risk greatly heightened by Mr. Bucklew's partially obstructed airway.
>
> *     *     *     *     *
>
> [The Department of Corrections has advised it would not use a dye in flushing the intravenous line because Dr. Zivot warned that might cause a spike in Bucklew's blood pressure.] Reactionary changes at the eleventh hour, without the guidance of imaging or tests, create a substantial risk to Mr. Bucklew, who suffers from a complex and severe medical condition *that has compromised his veins*.
>
> *     *     *     *     *
>
> The DOC seems to acknowledge they agree with Dr. Zivot that Mr. Bucklew's obstructed airway presents substantial risks of needless pain and suffering, but what they plan to do about it is a mystery. Will they execute Mr. Bucklew in a seated position? . . . The DOC should be required to disclose how it plans to execute Mr. Bucklew so that this Court can properly assess whether additional risks are present. . . . Until

> Mr. Bucklew knows what protocol the DOC will use to kill him, and until the DOC is required to conduct the necessary imaging and testing to quantify the expansion of Mr. Bucklew's hemangiomas and the extent of his airway obstruction, it is not possible to execute him without substantial risk of severe pain and needless suffering.

Defendants' Suggestions in Opposition argued that Bucklew's "proposed changes . . . with the exception of his complaint about [dye], which Missouri will not use in Bucklew's execution, are not really changes in the method of execution."

Glossip and Baze established two requirements for an Eighth Amendment challenge to a method of execution. First, the challenger must "establish that the method presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." Glossip, 135 S. Ct. at 2737 (emphasis in original), citing Baze, 553 U.S. at 50. This evidence must show that the pain and suffering being risked is severe *in relation to* the pain and suffering that is accepted as inherent in any method of execution. Id. at 2733. Second, the challenger must "identify an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." Glossip, 135 S. Ct. at 2737, citing Baze, 553 U.S. at 52. This two-part standard governs as-applied as well as facial challenges to a method of execution. See, e.g., Jones v. Kelley, 854 F.3d 1009, 1013, 1016 (8th Cir. 2017); Williams v. Kelley, 854 F.3d 998, 1001 (8th Cir. 2017); Johnson v. Lombardi, 809 F.3d 388, 390 (8th Cir. 2015); Bucklew I, 783 F.3d at 1123, 1127. As a panel we are bound by these controlling precedents. Bucklew argues the second Baze/Glossip requirement of a feasible alternative method of execution that substantially reduces the risk of suffering should not apply to "an individual who is simply too sick and anomalous to execute in a constitutional manner," like those who may not be executed for mental health reasons. See, e.g., Ford v. Wainwright, 477 U.S. 399, 410 (1986). The Supreme Court has not recognized a categorical exemption from the death penalty for individuals with physical ailments or disabilities. Thus, in the decision on appeal, the district court

properly applied the Baze/Glossip two-part standard in dismissing Bucklew's as-applied claim.

We concluded in Bucklew I, based on a record "which went well beyond the four corners of Bucklew's complaint," that the complaint's allegations, bolstered by defendants' concession "that the Department's lethal injection procedure *would be changed* on account of his condition by eliminating the use of methylene blue dye," sufficiently alleged the first requirement of an as-applied challenge to the method of execution -- "a substantial risk of serious and imminent harm that is sure or very likely to occur." 783 F.3d at 1127. We further concluded the district court's *sua sponte* dismissal was premature because these detailed allegations made it inappropriate "to assume that Bucklew would decline an invitation to amend the as-applied challenge" to plausibly allege a feasible and more humane alternative method of execution, the second requirement under the Baze/Glossip standard. Id. In remanding, we directed that further proceedings "be narrowly tailored and expeditiously conducted to address only those issues that are essential to resolving" the as-applied challenge. Id. at 1128. We explained:

> Bucklew's arguments on appeal raise an inference that he is impermissibly seeking merely to investigate the protocol without taking a position as to what is needed to fix it. He may not be "permitted to supervise every step of the execution process." Rather, at the earliest possible time, he must identify a feasible, readily implemented alternative procedure that will *significantly* reduce a substantial risk of severe pain and that the State refuses to adopt. . . . Any assertion that all methods of execution are unconstitutional does not state a plausible claim under the Eighth Amendment or a cognizable claim under § 1983.

Id. (quotation omitted; emphasis in original).

## II.

On remand, consistent with our directive, the district court first ordered Bucklew to file an amended complaint that adequately identified an alternative procedure. Twice, Bucklew filed amended complaints that failed to comply with this order. Given one last chance to comply or face dismissal, on October 13, 2015, Bucklew filed a Fourth Amended Complaint. As relevant here, it alleged:

> 106. Based on Mr. Bucklew's unique and severe condition, there is no way to proceed with Mr. Bucklew's execution under Missouri's lethal injection protocol without a substantial risk to Mr. Bucklew of suffering grave adverse events during the execution, including hemorrhaging, suffocating or experiencing excruciating pain.
>
> 107. Under any scenario or with any of lethal drug, execution by lethal injection poses an enormous risk that Mr. Bucklew will suffer extreme, excruciating and prolonged pain -- all accompanied by choking and struggling for air.
>
> 128. In May 2014, the DOC also proposed a second adjustment in its protocol, offering to adjust the gurney so that Mr. Bucklew is not lying completely prone.[3] . . . As a practical matter, no adjustment would likely be sufficient, as the stress of the execution may unavoidably cause Mr. Bucklew's hemangiomas to rupture, leading to hemorrhaging, bleeding in his throat and through his facial orifices, and coughing and choking on his own blood.
>
> 129. In order to fully evaluate and establish the risks to Mr. Bucklew from execution by lethal injection, a full and complete set of imaging studies must be conducted.

---

[3]In their answer to paragraph 128, defendants alleged: "Defendants admit that the Defendants offered to have the anesthesiologist position the angle of the gurney in a proper position." Thus, this fact was established by the pleadings.

> 139.  Mr. Bucklew is mindful of the Court's directive to allege a feasible, readily implemented alternative procedure . . . .  Mr. Bucklew has complied . . . by researching and proposing execution by lethal gas, which is specifically authorized by Missouri law and which Missouri's Attorney General has stated the DOC is prepared to implement.

> 150.  In adherence with the pleading requirements set forth in *Glossip*, and as stated above, Mr. Bucklew specifically alleges lethal gas as a feasible and available alternative method that will significantly reduce the risk of severe pain to Mr. Bucklew.

In other words, Bucklew took the position that no modification of Missouri's lethal injection method of execution could be constitutionally applied to execute Bucklew. He proposed massive discovery allegedly needed to establish the first Baze/Glossip requirement.  But his legal theory is that alternative procedures such as adjusting the gurney's position are irrelevant because *no* lethal injection procedure would be constitutional, only a change to the use of lethal gas would be adequate.

Bucklew's as-applied claim focused on two aspects of his medical condition. First, Bucklew's experts initially opined that his peripheral veins are so weak that injection of a lethal dose of pentobarbital would not adequately circulate, leading to a prolonged and painful execution.  The district court concluded that discovery and expert opinions developed on remand refuted this claim.  The lethal injection protocol provides that medical personnel may insert the primary intravenous (IV) line "as a central venous line" and may dispense with a secondary peripheral IV line if "the prisoner's physical condition makes it unduly difficult to insert more than one IV." Bucklew's expert Dr. Zivot conceded, and Defendants' expert, Dr. Joseph Antognini, agreed, that the central femoral vein can circulate a "fair amount of fluid" without serious risk of rupture and that Bucklew's medical condition will not affect the flow of pentobarbital after it is injected through this vein.

Second, Bucklew's experts opined that his condition will cause him to experience severe choking and suffocation during execution by lethal injection. When Bucklew is supine, gravity pulls the hemangioma tumor into his throat which causes his breathing to be labored and the tumor to rupture and bleed. When conscious, Bucklew can "adjust" his breathing with repeated swallowing that prevents the tumor from blocking his airway. But during the "twilight stage" of a lethal injection execution, Dr. Zivot opined that Bucklew will be aware he is choking on his own blood and in pain before the pentobarbital renders him unconscious and unaware of pain. Based on a study of lethal injections in horses, Dr. Zivot estimated there could be a period as short as 52 seconds and as long as 240 seconds when Bucklew is conscious but immobile and unable to adjust his breathing; his attempts to breath will create friction, causing the tumor to bleed and possibly hemorrhage. In Dr. Zivot's opinion, there is a "very, very high likelihood" that Bucklew will suffer "choking complications, including visible hemorrhaging," if he is executed by *any* means of lethal injection, including using the drug pentobarbital.

According to Defendants' expert, Dr. Antognini, pentobarbital causes death by "producing rapid, deep unconscious[ness], respiratory depression, followed by . . . complete absence of respiration, decreased oxygen levels, slowing of the heart, and then the heart stopping." In contrast to Dr. Zivot, Dr. Antognini opined that pentobarbital would cause "rapid and deep unconsciousness" within 20-30 seconds of entering Bucklew's blood stream, rendering him insensate to bleeding and choking sensations. Dr. Antognini also challenged Dr. Zivot's opinion that a supine Bucklew, unable to adjust his breathing, will be aware he is choking on his own blood and in pain from the tumor blocking his airway before the pentobarbital renders him unconscious. Dr. Antognini noted that, between 2000 and 2003, Bucklew underwent general anesthesia eight times, at least once in a supine position. In December 2016, Bucklew lay supine for over an hour undergoing an MRI, with no more than discomfort. The MRI revealed that his tumor had slightly shrunk since 2010.

In granting defendants summary judgment, the district court declined to rely on the first Glossip/Baze requirement because these conflicting expert opinions "would permit a factfinder to conclude that for as long as four minutes [after the injection of pentobarbital Bucklew] could be aware that he is choking or unable to breathe but be unable [to] 'adjust' his breathing to remedy the situation." Rather, the court held that Bucklew failed to provide adequate evidence that his alternative method of execution -- lethal gas -- was a "feasible, readily implemented" alternative that would "in fact significantly reduce a substantial risk of severe pain" as compared to lethal injection. Glossip, 135 S.Ct. at 2737; Baze, 553 U.S. at 52.

## III.

To succeed in his challenge to Missouri's lethal injection execution protocol, Bucklew must establish both prongs of the Glossip/Baze standard. Glossip, 135 S. Ct. 2737. The district court held that Bucklew failed to establish the second prong of Glossip/Baze by showing that an alternative method of execution would "in fact significantly reduce a substantial risk of severe pain." As noted, Bucklew argues the Glossip/Baze standard should not apply to an as-applied challenge to a method of execution, an argument our controlling precedents have rejected. He raises two additional issues on appeal.

**A.** Bucklew first argues the district court erred in granting summary judgment on the second Glossip/Baze requirement because he presented sufficient evidence that his proposed alternative method of execution -- death through nitrogen gas-induced hypoxia -- "would substantially reduce his suffering." Summary judgment is not appropriate when there are material issues of disputed fact, and the Supreme Court in Glossip made clear that this issue may require findings of fact that are reviewed for clear error. See 135 S. Ct. at 2739-41 (majority opinion) and 2786 (Sotomayor, J., dissenting). However, whether a method of execution "constitutes cruel and unusual punishment is a question of law." Swindler v. Lockhart, 885 F.2d 1342, 1350 (8th

-10-

Cir. 1989). Thus, unless there are material underlying issues of disputed fact, it is appropriate to resolve this ultimate issue of law by summary judgment.

Nitrogen hypoxia is an authorized method of execution under Missouri Law. See Mo. Stat. Ann. § 546.720. Missouri has not used this method of execution since 1965 and does not currently have a protocol in place for execution by lethal gas. But there are ongoing studies of the method in other States and at least preliminary indications that Missouri will undertake to develop a protocol. Defendants do not argue this is not a feasible and available alternative.

The district court granted summary judgment based on Bucklew's failure to provide adequate evidence that execution by nitrogen hypoxia would substantially reduce the risk of pain or suffering. The court allowed Bucklew extensive discovery into defendants' knowledge regarding execution by lethal gas. But Missouri's lack of recent experience meant that this discovery produced little relevant evidence and no evidence that the risk posed by lethal injection is substantial *when compared to* the risk posed by lethal gas. See Glossip, 135 S. Ct. at 2738; Johnson, 809 F.3d at 391. Bucklew's *theory* is that execution by nitrogen hypoxia would render Bucklew insensate more quickly than lethal injection and would not cause choking and bleeding in his tumor-blocked airway. But his expert, Dr. Zivot, provided no support for this theory. Dr. Zivot's Supplemental Expert Report explained:

> [W]hile I can assess Mr. Bucklew's current medical status and render an expert opinion as to the documented and significant risks associated with executing Mr. Bucklew under Missouri's current Execution Procedure, I cannot advise counsel or the Court on how to execute Mr. Bucklew in a way that would satisfy Constitutional requirements.

Lacking affirmative comparative evidence, Bucklew relied on Dr. Antognini's deposition. In his Expert Report, Dr. Antognini concluded that "the use of lethal gas

-11-

would not significantly lessen any suffering or be less painful than lethal injection in this inmate." At his deposition, Dr. Antognini was asked:

> Q. Why does lethal gas not hold any advantage compared to lethal injection.
>
> A. Well . . . there are a lot of types of gases that could be used . . . . [U]sing gas would not significantly lessen any suffering or be less painful. Because, again, their onset of action is going to be relatively fast, just like Pentobarbital's onset -- onset of action.
>
> Q. That's it? Simply because it would happen quickly?
>
> A. Correct.

The district court concluded this opinion provided nothing to compare:

> Dr. Antognini specifically stated that he believed there would be no difference in the "speed" of lethal gas as compared to pentobarbital. . . . In the absence of evidence contradicting Defendants' expert and supporting Plaintiff's theory, there is not a triable issue.

On appeal, Bucklew argues the district court should have compared Dr. Zivot's opinion that lethal injection would take up to four minutes to cause Bucklew's brain death with Dr. Antognini's testimony that lethal gas would render him unconscious in the same amount of time as lethal injection, 20 to 30 seconds. But Dr. Antognini's comparative testimony was that both methods would result in unconsciousness in approximately the same amount of time. Bucklew offered no contrary *comparative* evidence and thus the district court correctly concluded that he failed to satisfy his burden to provide evidence "establishing a known and available alternative that would significantly reduce a substantial risk of severe pain." McGehee v. Hutchinson, 854 F.3d 488, 493 (8th Cir. 2017).

-12-

In addition, Bucklew's claim that he will experience choking sensations during an execution by lethal injection but not by nitrogen hypoxia rests on the proposition that he could be seated during the latter but not the former. He argues there is evidence he will be forced to remain supine during an execution by lethal injection, when his tumor will cause him to sense he is choking on his own blood, whereas he could remain seated during the administration of lethal gas, which would not cause a choking sensation. But this argument lacks factual support in the record. Having taken the position that *any* lethal injection procedure would violate the Eighth Amendment, Bucklew made no effort to determine what changes, if any, the DOC would make in applying its lethal injection protocol in executing Bucklew, other than defendants advising -- prior to remand by this court -- that dye would not be used.

Based on Bucklew's argument to the en banc court, we expected that the core of the proceedings on remand would be defining what changes defendants would make on account of Bucklew's medical condition and then evaluating *that modified procedure* under the two-part Baze/Glossip standard. On remand, Director of Corrections Ann Precythe testified that the medical members of the execution team are provided a prisoner's medical history in preparing for the execution. Precythe has authority to make changes in the execution protocol, such as how the primary IV line will be inserted in the central femoral vein or how the gurney will be positioned, if the team advises that changes are needed. While Bucklew sought and was denied discovery of the identities of the execution team's medical members, he never urged the district court to establish a suitable fact-finding procedure -- for example, by anonymous interrogatories or written deposition questions to the execution team members -- for discovery of facts needed for the DOC to define the as-applied lethal injection protocol it intends to use for Bucklew. As Bucklew did not pursue these issues, the pleadings established that defendants have proposed to reposition the gurney during Bucklew's deposition, and Director Precythe testified that she has authority to make this type of change in the execution protocol based on the execution team's advice based on review of Bucklew's medical history, but the record does not

-13-

disclose whether Bucklew will in fact be supine during the execution,[4] nor does it disclose that a "cut-down" procedure will not be used to place the primary IV line in his central femoral vein, a procedure Dr. Antognini opined was unnecessary. Bucklew simply asserts that, in comparing execution by lethal injection and by lethal gas, we must accept his speculation that defendants will employ these risk-increasing procedures. This we will not do.

Like the district court, we conclude the summary judgment record contains no basis to conclude that Bucklew's risk of severe pain would be substantially reduced by use of nitrogen hypoxia instead of lethal injection as the method of execution. Evidence that "is equivocal, lacks scientific consensus and presents a paucity of reliable scientific evidence" does not establish that an execution is sure or very likely to cause serious illness and needless suffering. Williams v. Kelley, 854 F.3d at 1001 (quotation omitted). Therefore, he failed to establish the second prong of the Glossip/Baze standard.

**B.** Bucklew further contends the district court erred in denying his requests for discovery relating to "M2" and "M3," two members of the lethal injection execution team. Bucklew argues he was entitled to discovery of the medical technicians' qualifications, training, and experience because it would "illuminate the nature and extent of the risks of suffering he faces." For example, if M3 was not qualified to safely place his IV in the central femoral vein, this would directly impact the risk of

---

[4]Dr. Zivot surmised that Bucklew will be required to lie flat during lethal injection based on what he observed at an execution in Georgia. He gave no reason to believe that pentobarbital could not be injected through a femoral vein while Bucklew is seated. He merely opined that "[i]t's more difficult" to administer an anesthetic to someone who is sitting up. Dr. Antognini, in addition to opining that Bucklew would be rendered unconscious and insensate within 20 to 30 seconds of pentobarbital injection, noted that it was not necessary that Bucklew be supine in order to inject pentobarbital in his femoral vein.

pain and suffering.  We review a district court's discovery rulings narrowly and with great deference and will reverse only for a "gross abuse of discretion resulting in fundamental unfairness."  Marksmeier v. Davie, 622 F.3d 896, 903 (8th Cir. 2010).

Bucklew's argument proceeds from the premise that M2 and M3 may not be qualified for the positions for which they have been hired.  But we will not assume that Missouri employs personnel who are incompetent or unqualified to perform their assigned duties.  See Clemons v. Crawford, 585 F.3d 1119, 1128 (8th Cir. 2009).  He further argues that deposition of M2 and M3 is necessary to understand how they will handle a circumstance in case something goes wrong during Bucklew's execution.  The potentiality that something may go wrong in an execution does not give rise to an Eighth Amendment violation.  Zink, 783 F.3d at 1101.  "Some risk of pain is inherent in any method of execution -- no matter how humane -- if only from the prospect of error in following the required procedure. . . . [A]n isolated mishap alone does not give rise to an Eighth Amendment violation."  Baze, 553 U.S. at 47, 50.  Thus, the district court's ruling was consistent with our instruction in remanding that Bucklew "may not be permitted to supervise every step of the execution process."  Bucklew I, 783 F.3d at 1128 (quotation omitted).  The Baze/Glossip evaluation must be based on the as-applied pre-execution protocol, assuming that those responsible for carrying out the sentence are competent and qualified to do so, and that the procedure will go as intended.

## III. Conclusion

Having thoroughly reviewed the record, we conclude that Bucklew has failed to establish that lethal injection, as applied to him, constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments.  Therefore, we affirm the judgment of the district court.

COLLOTON, Circuit Judge, dissenting.

Russell Bucklew alleges that the State of Missouri's method of execution by lethal injection violates his rights under the Eighth and Fourteenth Amendments. He seeks an injunction prohibiting an execution by that method. The district court granted summary judgment for the State, but there are genuine disputes of material fact that require findings of fact by the district court before this dispute can be resolved. I would therefore remand the case for the district court promptly to conduct further proceedings.

Bucklew's claim under 42 U.S.C. § 1983 requires him to prove two elements: (1) that the State's method of execution is sure or very likely to cause him severe pain, and (2) that an alternative method of execution that is feasible and readily implemented would significantly reduce the substantial risk of severe pain. *Glossip v. Gross*, 135 S. Ct. 2726, 2737 (2015); *Bucklew v. Lombardi*, 783 F.3d 1120, 1123, 1128 (8th Cir. 2015) (en banc). On the first element, the district court concluded that taking the evidence in the light most favorable to Bucklew, there is a substantial risk under Missouri's lethal injection protocol that Bucklew will experience choking and an inability to breathe for up to four minutes. On the second element, however, the court ruled as a matter of law that Bucklew's suggested alternative method—execution by administration of nitrogen gas—would not significantly reduce the substantial risk that the court identified under the first element. In my view, the district court's reasoning as to the first element is inconsistent with its summary disposition of Bucklew's claim on the second.

On the first element, Bucklew's theory is that he will suffer severe pain by prolonged choking or suffocation if the State executes him by lethal injection. He contends that when he lies supine on the execution gurney, tumors in his throat will block his airway unless he can "adjust" his positioning to enable breathing. Bucklew

argues that if an injection of pentobarbital renders him unable to adjust his positioning while he can still sense pain, then he will choke or suffocate.

In assessing that claim, the district court cited conflicting expert testimony from Bucklew's expert, Dr. Joel Zivot, and the State's expert, Dr. Joseph Antognini. Dr. Antognini testified that if the State proceeded by way of lethal injection using pentobarbital, then Bucklew would be unconscious within twenty to thirty seconds and incapable of experiencing pain at that point. R. Doc. 182-5, at 10, 40-41. Dr. Zivot, however, differed: "I strongly disagree with Dr. Antognini's repeated claim that the pentobarbital injection would result in 'rapid unconsciousness' and therefore Mr. Bucklew would not experience any suffocating or choking." R. Doc. 182-1, at 147. Zivot opined that Bucklew "would likely experience unconsciousness that sets in progressively as the chemical circulates through his system," and that "during this in-between twilight stage," Bucklew "is likely to experience prolonged feelings of suffocation and excruciating pain." *Id.*

In his deposition, Dr. Zivot opined that "there will be points," before Bucklew dies, "where he's beginning to experience the effects of the pentobarbital, where his ability to control and regulate and adjust his airway will be impaired, although there will still be the experience capable of knowing that he cannot make the adjustment, and will experience it as choking." *Id.* at 81. When directed to Dr. Antognini's opinion that Bucklew would be unaware of noxious stimuli within twenty to thirty seconds of a pentobarbital injection, Dr. Zivot observed that Antognini's opinion was based on a study involving dogs from fifty years ago and testified that his "number would be longer than that." *Id.* at 85. When asked for his "number," Dr. Zivot pointed to a study on lethal injections administered to horses; he said the study recorded "a range of as short as fifty-two seconds and as long as about two hundred and forty seconds before they see isoelectric EEG." *Id.* at 85-86. Dr. Zivot noted that the "number" that he derived from the horse study was "more than twice as long as" the number suggested by Dr. Antognini. *Id.* at 86. He defined "isoelectric EEG" as

"indicative of at least electrical silence on the parts of the brain that the electroencephalogram has access to." *Id.*

The district court observed that "[a]n execution is typically conducted with the prisoner lying on his back," and that the record "establishes that [Bucklew] has difficulty breathing while in that position because the tumors can cause choking or an inability to breathe." The court understood Dr. Zivot to mean that "it could be fifty-two to 240 seconds before the pentobarbital induces a state in which [Bucklew] could no longer sense that he is choking or unable to breathe." Thus, the court concluded that "construing the Record in [Bucklew's] favor reveals that it could be fifty-two to 240 seconds before the pentobarbital induces a state in which [Bucklew] could no longer sense that he is choking or unable to breathe." Again, the court reasoned that "the facts construed in [Bucklew's] favor would permit a factfinder to conclude that for as long as four minutes [Bucklew] could be aware that he is choking or unable to breathe but be unable to 'adjust' his breathing to remedy the situation." On that basis, the court presumed for purposes of the motion for summary judgment that "there is a substantial risk that [Bucklew] will experience choking and an inability to breathe for up to four minutes."

The State disputes that there is a genuine dispute of material fact on the first element of Bucklew's claim, but the district court properly concluded that findings of fact were required. Bucklew pointed to evidence from Missouri corrections officials that prisoners have always laid flat on their backs during executions by lethal injection in Missouri. R. Doc. 182-7, at 10; R. Doc. 182-9, at 1; R. Doc. 182-12, at 29, 91. One official testified that he did not know whether the gurney could be adjusted. R. Doc. 182-12, at 91. Another official believed that the head of the gurney "could" be raised (or that a gurney with that capability could be acquired), and that an anesthesiologist would have "the freedom" to adjust the gurney "if" he or she determined that it would be in the best medical interest of the offender to do so. R. Doc. 182-7, at 14. But the State did not present evidence about how it would position

-18-

Bucklew or the gurney during his execution. On a motion for summary judgment, the district court was required to construe the evidence in the light most favorable to Bucklew. Under that standard, without undisputed evidence from the State that it would alter its ordinary procedures, the court did not err by concluding that a finder of fact could infer that the State would proceed as in all other executions, with Bucklew lying on his back.[5]

The State argues that the district court erred in discerning a genuine dispute of material fact on the first element because Dr. Zivot did not specify the length of the expected "twilight stage" during which Bucklew would be unable to adjust his positioning yet still sense pain. The State also complains that Dr. Zivot did not specify that Bucklew's pain awareness would continue for fifty-two seconds or longer until brain waves ceased. There certainly are grounds to attack the reliability and credibility of Dr. Zivot's opinion, including the imprecision of some of his testimony, his opposition to all forms of lethal injection, his possible misreading of the horse study on which he partially relied, and his inaccurate predictions of calamities at prior executions. But he did opine that Bucklew was likely to "experience prolonged feelings of suffocation and excruciating pain" if executed by lethal injection, R. Doc. 182-1, at 147, and that there "will be points" before Bucklew dies when his ability to regulate his airway will be impaired so that he "will experience it as choking." *Id.* at

[5]Bucklew alleged in Paragraph 128 of his complaint that the State had offered to adjust the gurney so that Bucklew is not lying completely prone, but then continued as follows immediately thereafter: "Although the stated intent was to reduce the choking risk to Mr. Bucklew, the DOC has obtained no imaging studies of Mr. Bucklew since 2010, and therefore has no information on which to base any decisions about the angle of the gurney." R. Doc. 53, at 43-44. The district court noted the State's suggestion "that the execution could be performed with [Bucklew] in a different position," but explained that "there is no evidence whether this has an effect on the procedure as a whole," and concluded that the State had "not provided the Court with a basis for granting summary judgment based on the possibility of performing the execution with [Bucklew] in a sitting (or other) position."

81. The district court did not err in concluding that it could not resolve the dispute between the experts on summary judgment.

On the second element of Bucklew's claim, the district court concluded as a matter of law that Bucklew failed to show that his proposed alternative method of execution—administration of nitrogen gas—would significantly reduce the substantial risk of severe pain that the court recognized under the first element. The majority affirms the district court's judgment on this basis. Taking the evidence in the light most favorable to Bucklew, however, a factfinder could conclude that nitrogen gas would render Bucklew insensate more quickly than pentobarbital and would thus eliminate the risk that he would experience prolonged feelings of choking or suffocation. Dr. Antognini testified that a person who is administered nitrogen gas "would be unconscious very quickly," and that the onset of action from lethal gas "is going to be relatively fast, *just like Pentobarbital's onset*." R. Doc. 182-5, at 58-59 (emphasis added). Given Dr. Antognini's testimony that pentobarbital would render Bucklew insensate within twenty to thirty seconds, the record in the light most favorable to Bucklew supports a finding based on Antognini's testimony that nitrogen gas would relieve Bucklew from any pain of choking or suffocating within twenty to thirty seconds. A trier of fact may accept all, some, or none of a witness's testimony, *United States v. Candie*, 974 F.2d 61, 65 (8th Cir. 1992), and a plaintiff may rely on testimony from the defendant's expert to meet his burden if the testimony is advantageous to the plaintiff. *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016). If the factfinder accepted Dr. Zivot's testimony as to the effect of pentobarbital, and Dr. Antognini's uncontroverted testimony as to effect of nitrogen gas, then Bucklew's proposed alternative method would significantly reduce the substantial risk of severe pain that the district court identified in its analysis of the first element.

For these reasons, there are genuine disputes of material fact that preclude summary judgment and require findings of fact by the district court. I would

therefore remand the case for further proceedings. The district court may then promptly make appropriate factual findings about, among other things, how Bucklew will be positioned during an execution, whether his airway will be blocked during an execution, and how pentobarbital (and, if necessary, nitrogen gas) will affect his consciousness and ability to sense potential pain.

\*  \*  \*

The State contends that we should not reach the merits of Bucklew's claim because several procedural obstacles require dismissal of his complaint. The majority does not rely on these points, and I find them unavailing.

First, the State contends that Bucklew did not raise his present claim in his fourth amended complaint. Bucklew's complaint, however, does allege the essence of his current theory. The complaint asserts that the tumors in Bucklew's throat require "him to sleep with his upper body elevated" because if he lies flat, "the tumor then fully obstructs his airway." *Id.* at 18-19. It continued: "Executions are conducted on a gurney, and the risks arising from Mr. Bucklew's airway are even greater if he is lying flat. Because of the hemangiomas, Mr. Bucklew is unable to sleep in a normal recumbent position because the tumors cause greater obstruction in that position." R. Doc. 53, at 35. Bucklew further alleged that execution by lethal injection "poses an enormous risk that Mr. Bucklew will suffer extreme, excruciating and prolonged pain – all accompanied by choking and struggling for air." *Id*. at 36. The complaint was adequate under a notice pleading regime to raise a claim that the execution procedure would result in an obstructed airway and choking or suffocation.

If necessary, moreover, the district court acted within its discretion by treating the complaint as impliedly amended to include Bucklew's present claim. *See* Fed. R. Civ. P. 15(b)(2). Bucklew clearly notified the State of his contention in his opposition to the State's motion for summary judgment. R. Doc. 192-1, at 1-3, 11-17.

-21-

Yet rather than communicate surprise and object that the claim was not pleaded, the State addressed Bucklew's contention on the merits. R. Doc. 200, at 4-5. Where a party has actual notice of an unpleaded issue and has been given an adequate opportunity to cure any surprise resulting from a change in the pleadings, there is implied consent to an amendment. *Trip Mate, Inc. v. Stonebridge Cas. Ins. Co.*, 768 F.3d 779, 784-85 (8th Cir. 2014).

Second, the State argues that the five-year statute of limitations bars Bucklew's claim, because he was aware of his claim in 2008 and did not file his complaint until May 9, 2014. A claim under § 1983 accrues when a plaintiff has "a complete and present cause of action" and "can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)). Bucklew asserts that he did not have knowledge of his present claim, and therefore could not have filed suit and obtained relief, until his medical condition progressed and he was examined by Dr. Zivot in April 2014. As evidence that Bucklew could have brought his claim earlier, the State relies on a 2008 petition that Bucklew submitted to the Missouri Supreme Court. The petition sought funding for an expert witness to investigate the interaction of the State's existing execution protocol with Bucklew's health condition. The possible claim addressed in the 2008 funding petition, however, focused on the potential for uncontrolled bleeding and ineffective circulation of drugs within Bucklew's body under the State's former three-drug execution protocol. The petition does not demonstrate that Bucklew was then on notice of a claim that a future execution protocol using the single drug pentobarbital would create a substantial risk of severe pain resulting from tumors blocking his airway while laying supine during an execution.

Third, the State urges that Bucklew's claim is barred by *res judicata* or claim preclusion, because Bucklew could have litigated his as-applied challenge to the execution protocol in an earlier case styled *Zink v. Lombardi*, No. 12-04209-CV-C-

BP. In *Zink*, a group of inmates sentenced to death, including Bucklew, brought a facial challenge to Missouri's execution protocol. A complaint was filed in August 2012, and the eventual deadline for motions to amend pleadings was January 27, 2014. Principles of claim preclusion do not bar Bucklew's as-applied challenge if he was unaware of the basis for the claim in time to include it in the *Zink* litigation. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016). The State again points to Bucklew's 2008 funding petition in support of its preclusion defense, but for reasons discussed, that petition does not establish that Bucklew's present claim was available to him in 2008. At oral argument, the State argued that Bucklew could have added his as-applied challenge to the *Zink* litigation after he was examined by Dr. Zivot in April 2014, because the district court granted the *Zink* plaintiffs leave to amend their complaint in May 2014. But the court's order allowed the *Zink* plaintiffs leave to amend only a single count of the complaint to allege a feasible alternative method of execution. The order did not reopen the pleadings deadline for as-applied claims by the several individual plaintiffs. *See Zink v. Lombardi*, No. 12-04209-CV-C-BP, 2014 WL 11309998, at *4-5, 12 (W.D. Mo. May 2, 2014). The State therefore has not established that Bucklew's as-applied claim is barred by *res judicata*.

\*　　\*　　\*

For these reasons, I would reverse the judgment of the district court and remand for further proceedings to be conducted with dispatch.

_____