# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-3024

_____

Lance Shockley

*Petitioner - Appellant*

v.

Richard Adams, Warden, Eastern Reception and Diagnostic Correctional Center;
Heather Cofer, Warden, Potosi Correctional Center; Myles Strid, Director,
Division of Adult Institutions; Trevor Foley, Director, Department of Corrections

*Respondents - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: October 12, 2025
Filed: October 13, 2025

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

The question before us is whether Lance Shockley has a right to have his daughters serve as his spiritual advisors, including praying over him and touching him in the execution chamber after administering communion and anointing him with oil. On this record, we conclude the answer is no.

## I.

In Missouri, a warrant for an inmate's execution halts all in-person contact with outside visitors except one: a spiritual advisor. Shockley's two daughters, who are both ministers, wanted to be his. One would perform the communion, anoint him with oil, and then go to the viewing area. The other would head to the chamber afterward to touch and pray over him during the execution.

When the Department denied Shockley's request, it offered several alternatives. He could have a spiritual advisor who was not a relative, either from within or outside the prison, administer communion and the anointing oils. He could do it himself with the help of prison clergy. Or he could have his lawyer do it. Whichever option he chose, his daughters could "lead the spiritual ritual/proceeding and . . . provide direction" from behind a glass window.

Shockley wanted only his daughters to do it. After several unsuccessful appeals and a denied grievance, he sued in federal court, just five days before his execution. He claimed the denial of his requested accommodation by the Missouri Department of Corrections violated his rights under the First Amendment's Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1. He sought an order prohibiting his execution unless the Department fulfilled his requests, along with a preliminary injunction and a stay of execution.

After receiving a response from Missouri, the district court denied Shockley's requested relief and dismissed the case with prejudice. In this eleventh-hour appeal, Shockley asks us to stay his scheduled execution set for tomorrow.

## II.

"Last-minute stays should be the extreme exception . . . ." *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019). A stay, after all, "is an equitable remedy," not

"a matter of right." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Even an inmate "seeking [extra] time to challenge the manner in which the State plans to execute [him] must satisfy all of the [usual] requirements." *Id.*; *see Nken v. Holder*, 556 U.S. 418, 426 (2009) (listing them).

Missouri offers several reasons to deny Shockley's motion, but mindful of the short timeline, we focus on his failure to "ma[k]e a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 426 (citation omitted). Under RLUIPA, the threshold showing is "a substantial burden on [his] religious exercise." 42 U.S.C. § 2000cc-1(a). A winning claim requires even more. *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (describing the elements of a free-exercise claim).

Shockley's claim cannot get past the first step. *See Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009) (noting that it is a "*threshold*" requirement (emphasis added) (citation omitted)). Not before us is the *what*: the religious sacraments and a spiritual advisor from his own religion willing to touch and pray with him. *See* 42 U.S.C. § 2000cc-1(a). The prison will allow him to receive communion, anointment, and prayer. What he objects to is *who* will do it: he requests his daughters, not some other non-family spiritual advisor of his choice. Even if whoever he picks will be under their direction.

On this record, the fact that his daughters will have to remain behind glass while they do so does not "significantly inhibit or constrain" him from "manifest[ing] [a] central tenet of [his] individual religious beliefs" or "engag[ing] in . . . activities that are fundamental to [his] religion." *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053 (8th Cir. 2020) (citation omitted) (defining a "substantial burden"). It just reflects the reality that having family members in the execution chamber poses special dangers to everyone involved, from the staff in the room to the inmate

himself.[1]  According to a Missouri prison system official, they include "dislodg[ing] or disrupt[ing] I.V. lines, restraints, or . . . pillows" and "interfer[ing] with the carrying out of the execution, the solemnity and decorum of the execution chamber, [and] prison officials' responses during any potential emergency."

We must also be conscious of what is not in this record.  Although there is no question that Shockley prefers his daughters "to provide the religious sacraments and rituals he seeks," he never claims that they are his only spiritual advisors or the only ones able to do it in a way that is consistent with his religious beliefs.  He may share a unique spiritual bond with them, as he now argues on appeal, but that fact alone is not enough to create a "substantial burden on his religious exercise" when prison officials have offered to have them involved at every step.  *See Ramirez*, 595 U.S. at 425 ("A plaintiff bears the initial burden of proving that a prison policy implicates his religious exercise." (citation omitted)); *Van Wyhe*, 581 F.3d at 657 (rejecting a prisoner's substantial-burden claim because he did "not indicate how [the restriction] significantly inhibit[ed] or curtail[ed] his religious expression").

It is true that ministers are not fungible, but there must be some limits.  For example, what about an inmate who claims that the only acceptable spiritual advisor—one who must pray and lay hands on him in the execution chamber—is a fellow inmate who has offered spiritual guidance throughout his time in prison?  In this hypothetical scenario, surely the prison could make the inmate choose someone else without running afoul of RLUIPA.  The same should be true here, when Shockley claims he should receive not one—but two—family members to be with

---

[1]We face a binary choice, with no alternatives in between.  The Department has gone as far as it is willing to go in accommodating Shockley's request in the alternatives it has offered.  Shockley, on the other hand, is unwilling to accept any substitute for his daughters.  Nor does either side suggest a "le[ss] restrictive means," 42 U.S.C. § 2000cc-1(a)(2), that still addresses the risks posed by allowing outsiders like family into the execution chamber.  *See Ramirez v. Collier*, 595 U.S. 411, 430–31 (2022) (recognizing that they could drown out "subtle signs of trouble," cause "disruptions," intentionally or accidentally interfere with equipment, or undermine the "solemnity and decorum" of the proceedings).

him, rather than *any other* spiritual advisor of his choice. *See Bucklew*, 587 U.S. at 150 n.5 (suggesting that family members "obviously would not be allowed," consistent with a state statute prohibiting it). We conclude that, in the absence of "a substantial burden on [Shockley's] religious exercise," 42 U.S.C. § 2000cc-1(a), the prison did not have to agree.

III.

We accordingly deny the motion for a stay of execution.

_____